```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
COVINA 2000 VENTURES CORP. and GEORGE    :
BROTHERS INVESTMENT CO. LTD,             :
                      Plaintiffs,        :    06 Civ. 15497 (DLC)
                                         :
              -v-                        :    OPINION & ORDER
                                         :
MERRILL LYNCH, PIERCE, FENNER & SMITH,   :
INC. and IRENE S. NG,                    :
                      Defendants.        :
                                         :
-----------------------------------------X
```

Appearances:

For Plaintiffs:
David Francescani
Raymond R. Costello
Matthew L. Levine
Autumn J.S. Hwang
Fish & Richardson P.C.
Citigroup Center, 52nd Floor
153 East 53rd Street
New York, New York 10022

For Defendants:
Lawrence E. Fenster
Lawrence D. Ross
Matthew C. Plant
Bressler, Amery & Ross
17 State Street
New York, New York 10004

DENISE COTE, District Judge:

  Defendant Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch") moves for summary judgment, and plaintiffs move for partial summary judgment, on plaintiffs' complaint, which alleges that defendants took more than twelve million dollars from plaintiffs' corporate accounts without authorization. The

plaintiffs having failed to complain of the transfers within the one-year statutory limitations period, their common-law causes of action are precluded. As a consequence, Merrill Lynch's motion is granted.

BACKGROUND

The following facts are undisputed. Youxin (Kevin) Ma ("Ma"), a Chinese businessman, established the two plaintiff companies, Covina 2000 Ventures Corp. ("Covina") and George Brothers Investment Co. Ltd. ("George Brothers"), in 2000. Ma opened corporate accounts at Merrill Lynch on behalf of the two companies, signing a Customer Agreement for each account, and depositing a significant amount of capital in each. Defendant Irene S. Ng ("Ng")[1] was designated by Merrill Lynch to be the companies' representative.

Pursuant to the terms of the agreements originating these accounts, monthly statements reflecting account activity were to be sent to Ma at an address he provided. The agreements provided, in pertinent part, that the monthly statements were to be deemed "conclusive if not objected to by written notice delivered to [Merrill Lynch] within ten (10) days after delivery or communication of the reports or statements to [the account

---

[1] By Memorandum Opinion & Order dated July 26, 2007, Ng's motion to compel arbitration was granted, and plaintiffs' claims against her were stayed.

holder] by [Merrill Lynch]." The monthly statements themselves carried a similar disclaimer. Further, the agreements contained an acknowledgement that any communication sent from Merrill Lynch to the client is deemed to be given to the client "personally" upon sending, regardless of whether the client received the communication.

Between June 19, 2002 and April 12, 2004, more than $9 million was transferred out of the Covina and George Brothers accounts and into third-party accounts in California in more than twenty-five separate wire transfers.[2] For twenty-four of these transfers, Merrill Lynch received letters of authorization bearing the apparent signature of Ma, as the representative of Covina and George Brothers. Although there was no agreement between the plaintiffs and Merrill Lynch regarding a security procedure to authenticate wire transfers from the Covina and George Brothers accounts, twenty-one of the letters of authorization received by Merrill Lynch bear a notation indicating that the requests for wire transfers were confirmed with the client -- that is, with Ma.

---

[2] The parties do not agree on the number of wire transfers, and the documentary evidence does not indicate a precise number. Plaintiffs variously claim that there were twenty-six or twenty-eight transfers; Merrill Lynch claims there were twenty-nine. Nor do the parties agree on the sum of losses incurred by the plaintiffs. The figure ranges from $9.23 million to "at least" $12 million in the plaintiffs' own rendering of their loss.

3

During the time period when these transfers were made, Merrill Lynch had extensive office practices and procedures, followed in the regular course of its business, to ensure that monthly statements and other communications to its customers were properly addressed and mailed to the address selected by the customer. The addresses entered into Merrill Lynch's system for Covina and George Brothers were provided by Ma. These statements are the official record of all financial and securities transactions in customer accounts. Merrill Lynch's monthly statements show that the plaintiffs' accounts were charged for each allegedly unauthorized wire transfer. Ma claims that he did not receive monthly statements from Merrill Lynch "on a regular basis" between 2002 and 2004, the period when the transfers in question took place, and did not review any statements he did receive. Ma never notified Merrill Lynch that he was not receiving the statements.

Plaintiffs first objected to the allegedly unauthorized transfers on December 27, 2006, when they filed the complaint in this action. This was more than four years after the first -- and more than two years after the most recent -- allegedly unauthorized wire transfer. An amended complaint was filed on March 14, 2007.[3] In the plaintiffs' own words, the complaint

---

[3] The original complaint named Ma, Covina, and George Brothers as plaintiffs. Ng moved to dismiss this complaint for

describes a complex scenario "involving a former child television actress, forged documents, international intrigue, theft, utter mismanagement, and the disappearance of millions of dollars involving a Tiburon, California couple hiding from the FBI in Japan."  The complaint alleged that Merrill Lynch and Ng had defrauded the plaintiffs by transferring funds out of their accounts to third parties in California, stringing the plaintiffs along by offering them oral assurances that their funds were invested in "balanced and conservative" investment products and were therefore difficult to liquidate upon plaintiffs' request.  The complaint further alleged that the defendants had ceased to inform the plaintiffs of activity in their accounts to conceal the fraud, and that the defendants had fabricated the letters of authorization and forged Ma's signature.

The amended complaint brings six causes of action: for breach of contract, breach of fiduciary duty, fraud, conversion, negligence, and breach of the covenant of good faith and fair dealing.  Plaintiffs seek actual damages caused by defendants' alleged conduct, punitive damages, interest, and fees and costs.

---

lack of jurisdiction, claiming that there was a lack of diversity among the parties.  By stipulation so ordered by this Court on March 14, 2007, plaintiffs were directed to file an amended complaint removing Ng as a plaintiff and specifying the citizenship of Covina and George Brothers.  Ng's motion to dismiss was denied as moot.

Defendants have moved for summary judgment on the complaint, arguing principally that under Article 4-A of the New York Uniform Commercial Code, which they claim governs this dispute, plaintiffs' claims are barred by the statute's one-year limitations period.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); accord Sista, 445 F.3d at 169. That is, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

6

(1986).  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The parties agree that New York law governs this dispute. Merrill Lynch contends that plaintiffs' six common-law claims are precluded by Article 4-A of the New York Uniform Commercial Code ("UCC"), which governs funds transfers and generally displaces the common law with respect to actions covered by its provisions.  Article 4-A was enacted "to correct the perceived inadequacy of attempting to define rights and obligations in funds transfers by general principles of common law or by analogy to rights and obligations in negotiable instruments law or the law of check collection."  Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 102 (2d Cir. 1998) (citation omitted).  Quoting the Official Comment to Article 4-A, the Second Circuit has observed that its drafters made clear that the Article's provisions

> represent a careful and delicate balancing of
> competing interests and are intended to be the
> exclusive means of determining the rights, duties, and
> liabilities of the affected parties in any situation
> covered by particular provisions of the Article.
> Consequently, resort to principles of law or equity
> outside of Article 4A is not appropriate to create
> rights, duties and liabilities inconsistent with those
> stated in this Article.

Id. at 102-03 (citation omitted).  In interpreting this Official Comment, the Circuit "agree[d] with those courts that have interpreted the above language to preclude common law claims when such claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4-A."  Id. at 103.  Thus, on its motion for summary judgment, Merrill Lynch bears the burden of demonstrating that plaintiffs' common-law claims would impose liability inconsistent with Article 4-A, and would therefore be precluded by it.  Celotex Corp., 477 U.S. at 324.

Merrill Lynch argues that Sections A-4-204 and A-4-505 of the UCC expressly create the rights and liabilities arising out of unauthorized funds transfers.  Section A-4-204 "establishes a bank's basic obligation to make good on unauthorized and ineffective transfers," Regatos v. North Fork Bank, 838 N.E.2d 629, 632 (N.Y. 2005), and Section A-4-505 establishes an invariable one-year "period of repose," within which a bank customer claiming an unauthorized or ineffective transfer must make a demand for refund from the bank.  Together, defendant claims that these provisions "govern[] wire transfers and prescribe[] the rights and duties of both bank and customer with respect to allegedly unauthorized transfers."  Because "[e]ach of Plaintiffs' common law claims is derived from the same allegations relating to unauthorized wire transfers," Merrill

Lynch argues, those claims should be preempted by the UCC and subject to the one-year period of repose it mandates.

Merrill Lynch is correct that the provisions of Article 4-A limn the rights and obligations of banks and customers relating to unauthorized wire transfers. Plaintiffs' claims derive entirely from allegedly unauthorized wire transfers; they seek to vindicate their rights and hold their bank liable for these transfers. Thus the parties' rights and obligations with respect to unauthorized transfers are furnished by Article 4-A. Article 4-A only precludes plaintiffs' common-law claims, however, to the extent that they are inconsistent with the rights and obligations it establishes.

Merrill Lynch argues that plaintiffs' common-law claims are inconsistent with Article 4-A because under the UCC the claims would be time-barred, and thus vindication of plaintiffs' common-law claims would permit recovery in contravention of the UCC, which prohibits recovery for unauthorized funds transfers where a claimant fails to exercise ordinary care to determine if the order was not authorized. Section 4-A-505 of the UCC provides:

> If a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order, the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the

9

> bank of the customer's objection within one year after
> the notification was received by the customer.

Id. § 4-A-505. Merrill Lynch -- the "receiving bank" -- claims that plaintiffs -- the "customer" -- received notification reasonably identifying the allegedly unauthorized transfers in the form of monthly account statements, yet failed to notify Merrill Lynch of their objection to the transfers within the one-year period mandated by Section 4-A-505. Accordingly, it argues, plaintiffs' claims are time-barred.

Plaintiffs' claims are time-barred by Article 4-A because they had actual notice of the allegedly unauthorized transfers but failed to act within the statute's one-year period of repose. Both the New York Court of Appeals and the Second Circuit have recognized that, under New York law, proof of an office procedure, followed in the regular course of business for addressing and mailing notices, gives rise to a rebuttable presumption that the notices have been received by the intended recipient. See, e.g., Akey v. Clinton County, 375 F.3d 231, 235 (2d Cir. 2004); Leon v. Murphy, 988 F.2d 303, 309 (2d Cir. 1993); Gonzalez v. Ross, 393 N.E.2d 482, 483 (N.Y. 1979). Further, "personal knowledge of mailing procedures is required only to establish regular office procedure, not the particular mailing." Leon, 988 F.2d at 309 (citation omitted). In order to rebut the presumption, an intended recipient claiming not to

have received the notice must adduce specific evidence that the office procedure was not followed or that the notice was not received. "Denial of receipt, without more, is insufficient to rebut the presumption." Akey, 375 F.3d at 235.

Here, the undisputed facts show that, during the time period when the allegedly unauthorized transfers took place, Merrill Lynch had in place extensive office practices and procedures, followed in the regular course of its business, to ensure that monthly statements and other communications to its customers were properly addressed and mailed to the address selected by the customer. The testimony of Carlos M. Oliveira, the section manager of statements who oversaw the production, addressing, and mailing of monthly statements at Merrill Lynch during the time period at issue, describes the process in depth and on the basis of personal knowledge. Oliveira also explained that, while monthly statements for certain Merrill Lynch customers were returned as undeliverable during the time period in question, no statements sent to plaintiffs were returned. Further, Ma confirmed that the addresses to which Merrill Lynch sent the Covina and George Brothers statements between 2002 and 2004 were indeed correct. This evidence is sufficient to give rise to a rebuttable presumption that plaintiffs actually received the monthly statements during the pertinent time period.

Plaintiffs have offered no evidence to rebut this presumption. They claim only that, after 2002, they "stopped receiving copies of their account statements on a regular basis." The basis for this claim appears to be that an "exhaustive search was conducted for all of Plaintiffs' Merrill Lynch account statements," and only the March, April, and May 2002 were recovered. Plaintiffs "suspect that Merrill Lynch employee Ng somehow arranged for Plaintiffs' account statements to be intercepted in Hong Kong." This is patently insufficient to rebut the presumption of receipt. Plaintiffs' claims amount to little more than "[d]enial of receipt," which, "without more, is insufficient to rebut the presumption." Id.

Further, the notices "reasonably identif[ied]" the transfers, thus complying with the requirements of Section 4-A-505. There is no New York or Second Circuit case law interpreting the meaning of Section 505's "reasonably identifying" requirement. Nor does the phrase appear in other sections of Article 4-A. It does appear elsewhere in the UCC, however. Under Article 9, which governs secured transactions, in order to be valid as a properly recorded security interest, a UCC financing statement must provide a description of the collateral that "reasonably identifies what is described." N.Y. U.C.C. §§ 9-504, 9-108. Collateral is reasonably identified if its identity is "objectively determinable." N.Y. U.C.C. § 9-

12

108(b)(6). These provisions of Article 9 and Section A-4-505 are both concerned with providing adequate notice about the identity of a particular thing of value. Accordingly, their identical terms should be interpreted similarly. See, e.g., Flight Attendants v. Zipes, 491 U.S. 754, 758 n.2 (1989); United States v. Carr, 880 F.2d 1550, 1553 (2d Cir. 1989). Under an objective standard such as the one employed in Article 9, the statements provide sufficient information to identify each wire transfer and a sufficient basis for objecting to any transfer believed to be unauthorized. Each monthly statement identified the date and amount of the outgoing wire transfer, and provided an internal identification number for each transfer. In addition, the cover page of each statement indicated the account balance, reflecting the monthly diminution in funds effected by the transfers. While the identification number was only meaningful to Merrill Lynch, it could be used by the client to query any questionable transfer. But even under a more subjective standard, considering the facts and circumstances surrounding the transmission of the monthly statements to plaintiffs, the notices were reasonable. Plaintiffs are sophisticated businesses, run by a highly sophisticated businessman. While Ma's English-language skills might be limited, the notices provided him with the figures necessary to assess whether he had authorized the transfers. It should be

13

noted that all of the transfers at issue were in amounts between $100,000 and $475,000. Such figures, duly noted on the monthly statements, would not have escaped even the quickest glance by a reasonable person.

Merrill Lynch's monthly statements to plaintiffs conformed to the requirements of Article 4-A and plaintiffs are presumed to have received the statements. Accordingly, they were required under Article 4-A to object to the allegedly unauthorized transfers within one year of receipt of the statements. The latest transfer at issue took place April 12, 2004. Plaintiffs did not file their complaint until December 2007. Plaintiffs' claims are thus barred under Article 4-A. Consequently, the relief they seek on their common-law causes of action would be inconsistent with Article 4-A, and is precluded by it. Summary judgment is therefore granted in defendant's favor.

Plaintiffs raise a host of arguments. First, plaintiffs rightly observe that Article 4-A requires actual notice to trigger the one-year limitations period. They claim, however, that they did not receive actual notice, and that the cases supporting a presumption of receipt concern constructive notice. This argument is meritless. Where the facts give rise to a presumption of receipt, the intended recipient is presumed to

have actually received the notice at issue. The doctrine of constructive notice has no bearing on this case.

Second, plaintiffs contend that the monthly statements did not reasonably identify the allegedly unauthorized wire transfers, primarily because they did not name the transfer recipients. For the reasons described above, the information contained in the monthly statements was sufficient to allow a reasonable person to ascertain that a transfer was questionable, and to communicate that objection to Merrill Lynch. It should be noted, moreover, that Ma testified that he "never reviewed" the statements sent by Merrill Lynch. By his own admission, the amount and type of information identifying the allegedly unauthorized wire transfers in the monthly statements would therefore have made no difference to him.

Third, plaintiffs argue that Article 4-A's one-year limitations period is only applicable when there is a reasonable security procedure in place between the bank and the customer to confirm funds transfer requests. The parties agree that no such procedure was in place. Article 4-A's default rule that a bank will bear the loss of any unauthorized funds transfer is subject to exception when the bank and the customer agree on a "security procedure" to ensure that payment orders received by the bank are authorized. N.Y. U.C.C. §§ 4-A-202(2), 4-A-204(1). As the New York Court of Appeals explained, "[o]nly when a commercially

15

reasonable security procedure is in place (or has been offered to the customer) may the bank disclaim its liability for unauthorized transfers." Regatos, 5 N.Y.3d at 403. In the case at bar, the bank is not disclaiming its liability for the unauthorized transfers; rather, the plaintiffs are barred from asserting their claim in the first place. As the Official Comment to Section A-4-505 makes clear, "the obligation to refund [under Sections 4-A-202 and 4-A-404] may not be asserted by the customer if the customer had not objected to the debiting of the account within one year after the customer received notification of the debit." N.Y. U.C.C. § 4-A-505, Official Comment.

Finally, plaintiffs claim that the defendant has not offered a convincing argument as to why plaintiffs' common-law claims are inconsistent with, and therefore precluded by, Article 4-A. As discussed above, defendant has argued that vindication of plaintiffs' common-law claims would contravene the one-year "period of repose," which is meant to "give the bank relief from unknown liabilities of potentially indefinite duration." Regatos, 838 N.E.2d at 633. Permitting common-law claims to go forward more than two years after their accrual –– indeed, in some cases more than four years after their accrual –– would be wholly inconsistent with Article 4-A, and would do violence to the "fine-tuned balance" it has crafted "between the

16

customer and the bank as to who should bear the burden of unauthorized transfers." Id.

Because summary judgment is granted on the grounds discussed, the Court need not consider the parties' arguments concerning the enforceability of the ten-day objection period imposed by the account originating agreements. Nor must the Court address the parties' arguments concerning the availability of punitive damages for plaintiffs' claims.

CONCLUSION

Merrill Lynch's February 20, 2008 motion for summary judgment is granted, and plaintiffs' March 5 motion is denied.

SO ORDERED.

Dated: New York, New York
April 21, 2008

/s/ Denise Cote
DENISE COTE
United States District Judge